UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re:

FERGUSON CONVALESCENT　　　　　　　Chapter 11
HOME, INC.　　　　　　　　　　　　　　　　Case No. 16-30397-dof
　　　　　　　Debtor.　　　　　　　　　Hon. Daniel S. Opperman

_____/

# THE STATE OF MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES' OBJECTIONS TO DEBTOR'S FIRST AMENDED COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT

The State of Michigan Department of Health and Human Services (MDHHS) respectfully objects to the Debtor's First Amended Combined Plan of Liquidation and Disclosure Statement ("Combined Plan") insofar as it pertains to MDHHS and the Medicaid program for these reasons:

I. **The Combined Plan proposes to reject the Debtor's executory contract with MDHHS, i.e., its Medicaid enrollment agreement.**

Article X rejects all of the Debtor's executory contracts except that with McLaren and those involving the Asset Purchase Agreement. (Doc. 78, at 21.) Although the Debtor's counsel has informally denied that this provision was intended to reject its Medicaid enrollment

agreement, the Combined Plan continues to read this way.[1] This result could be problematic to the sale itself – in that Medicaid is the Debtor's primary source of revenue as a going concern.[2]

It is well-established that a Medicare provider agreement is an executory contract for bankruptcy purposes. *In re Advanced Professional Home Health Care, Inc.*, 94 Bankr. 95, 97 (E.D. Mich. 1988); *In re Heffernan Memorial Hospital*, 192 B.R. 228, 231 n. 4 (Bankr. S.D. Cal. 1996); *In re St. John's Home Health Agency*, 173 B.R. 238, 242 n. 1 (Bankr. S.D. Fla. 1994).

MDHHS therefore asks the Court to determine that, by virtue of its actions since filing this case, Debtor has assumed its Medicaid provider enrollment agreement and amend Article X accordingly.

II.  **The Combined Plan inappropriately seeks to curtail MDHHS's rights under federal and state Medicaid law and its enrollment agreement with the Debtor.**

MDHHS administers the jointly funded state-federal program under 42 U.S.C. §§ 1396 *et seq.*, known as Medicaid. Medicaid covers

---

[1] As an aside, the Combined Plan, § 12.4 misspells "principal."
[2] MDHHS questions what criteria the Debtor used in evaluating its bed licenses at $500,000 as a going concern. (Doc. 78, at 44.)

certain health care expenses on behalf of eligible indigent individuals. MDHHS has filed a Proof of Claim alleging that the Debtor is currently indebted to MDHHS for approximately $270,000. (Claim No. 7.)

As noted above, § 10 of the Plan rejects the Debtor's Medicaid provider enrollment agreement, and then limits MDHHS's ability to challenge any resulting claim. (See Combined Plan, §§ 10.5, 10.6.) The Courts have treated Medicare and Medicaid similarly in this respect.

The cessation of Medicaid payments as a result of Debtor's rejection of the enrollment agreement also creates an obstacle to MDHHS's right to set off or recoup from the Debtor in the ordinary course. See *In re Advanced Professional Home Health Care, Inc.*, *supra*. Similarly, the Combined Plan, § 5.4, proposes to enjoin MDHHS's right to set off or recoup from the Debtor, Purchaser, or Liquidation Trust. These provisions apparently seek to eliminate MDHHS's defenses and claims arising from the Medicaid program. Medicaid adopts many of Medicare's requirements.[3] With respect to the amounts that may be paid, the Medicare statute provides:

---

[3] Because both the Medicare and Medicaid Programs provide for the recovery of overpayments, common law recoupment claims are a recurring theme in bankruptcy cases involving health care providers.

3

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement ... the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments.

42 U.S.C. § 1395g(a). Similarly, under Medicaid, the right of recoupment arises under 42 U.S.C. § 1396b(d)(2)(C), which also provides that U.S. Department of Health & Human Services Centers for Medicare & Medicaid Services (CMS) may adjust its matching funds to the State to reflect overpayments or underpayments.

Bankruptcy courts have recognized that § 1395g(a) is Congress' basic blueprint for Medicare reimbursement. "There is no evading it or circumventing it, under any authority or at any time." *In re Tri County Home Health Services, Inc.,* 230 B.R. 106, 112 (Bankr. W. D. Tenn. 1999). A bankruptcy court "may not interfere with . . . the statutory prescription that [the Secretary] make 'necessary adjustments' to current payments to account for previously rendered overpayments." *In*

---

*See, e.g., TLC Hosp.,* 224 F.3d 1008; *United States v. Consumer Health Servs. of Am.,* 323 U.S. App. D.C. 336, 108 F.3d 390 (D.C. Cir. 1997); *University Med. Ctr. v. Sullivan (In re University Med. Ctr.),* 973 F.2d

4

*re Southern Inst. for Treatment & Evaluation*, 217 B.R. 962, 966 (Bankr. S.D. Fla. 1998). The Courts have applied similar reasoning with regard to the Medicaid program, e.g., permitting the Indiana Medicaid agency to recoup its funds from a nursing home. *In re CDM Management Services, Inc.,* 226 B.R. 195 (Bkrty. S.D. IN, 1997).

Similarly, the Medicare Principles of Reimbursement are incorporated by reference into the Debtor's Medicaid provider enrollment agreement. One of these principles, 42 C.F.R. § 489.18(c), establishes a presumption that the enrollment agreement will be assumed by the purchaser: "When there is a change of ownership as specified in paragraph (a) of this section, the existing provider agreement will automatically be assigned to the new owner." Accordingly, a Medicaid program may assert recoupment:

> Equitable principles support recoupment in this case. As noted above, the Medicaid system is premised on continuous payments and reconciliations that span fiscal years. This system gives those providers the cash flow they need to furnish services throughout the year. Over-payments occur routinely. It would be inequitable to deny the State the right to recoup those overpayments from current reimbursements when the Medicaid provider continues to receive the benefits of the Medicaid program. [*Ravenwood Healthcare, Inc v.*

1065 (3d Cir. 1992)." *In re Dist. Mem'l Hosp. of Southwestern N.C., Inc.*, 297 B.R. 451, 454 (W.D. N.C., 2002).

*Maryland*, 2007 U.S. Dist. LEXIS 40796 (D. Md. 2007), at *18-*19.]

Therefore, any order transferring the Debtor's Medicaid provider agreement may not be made "free and clear" of the Secretary's right to make the "necessary adjustments" required by 42 U.S.C. § 1395g(a), or of MDHHS's parallel right under 42 U.S.C. § 1396b(d)(2)(C). A debtor does not have *carte blanche* to create or impose any conditions it desires in a sale. Indeed, "[t]he purpose of bankruptcy is not to permit debtors or non-debtors to wrest competitive advantage by exempting themselves from the myriad of laws that regulate business." *In re White Crane Trading Co.*, 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994) (bankruptcy court could not authorize sale that would be inconsistent with consumer protection laws). *See also In re Welker*, 163 B.R. 488 (Bankr. N.D. Tex. 1994) (trustee could not sell real property without complying with procedures of U.S. Dept. of Housing and Urban Development).

In this vein, 11 U.S.C. § 363(f)(1) is not met, as applicable non-bankruptcy law does not authorize a free and clear transfer. *U.S. v. Vernon Home Health, Inc.*, 21 F. 3d 693, 696 (5th Cir. 1994), *cert. denied*, 513 U.S. 1015 (1994)("[A]ny purchase of assets that involves the assignment of the [Medicare] provider agreement is subject to the

6

relevant statutory and regulatory conditions. One of these conditions is that adjustments are made for overpayments, pursuant to 42 U.S.C. § 1395g(a).") MDHHS also has not consented; its statutory mandate to make "necessary adjustments" to payment is not an "interest" in property, much less a lien, rendering 11 U.S.C. §§ 363(f)(2) and (f)(3) inapplicable. Likewise, 11 U.S.C. § 363(f)(4) is satisfied only if the "interest" is in *bona fide* dispute, but even assuming *arguendo* that the "necessary adjustments" term of 42 U.S.C. § 1395g(a) and 42 U.S.C. § 1396b(d)(2)(C) constituted an "interest in property," there is no *bona fide* dispute about the existence of the "necessary adjustments" directive since that is clear from the text of the statute. Finally, under 11 U.S.C. § 363(f)(5), a sale of a debtor's property may be authorized free and clear of any interest *if* the holder of that interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. No legal or equitable proceeding could compel MDHHS to accept money to disregard or abrogate the statute by which Congress has directed its actions in running the Medicaid program. *See Maryland Dept. of Human Resources*, 976 F. 2d at 1480 ("An injunction

7

may not strip a federal agency of its power to exercise lawful authority conferred by Congress through statute.")

MDHHS, operating under its parallel authority, should have the same protection as CMS's Medicare program. To the extent that the Combined Plan curtails that protection, it should be rejected. The Combined Plan should therefore be rejected if construed to limit MDHHS's right to recoup from any current or future Medicaid payments, adding clarifying language to make explicit that any transfer does not eliminate that right.

III. **The Debtor's allocation of the total sales price does not fairly reflect the differences between the value of real estate and the value of an operating nursing home.**

The Debtor did not explain how it negotiated the sales price with the prospective buyer, nor did it attach the Letters of Intent (LOI) to its filing. But its description of the proposed terms of sale (Doc. 78, at 32) apportions a smaller portion of a total reported $2.0 million to the nursing home and a larger portion to the land. Since the land is owned by a trust, of which Debtor's principal Paul Ferguson is a 50% beneficiary, this allocation would net him about $600,000. Added to the $200,000 in compensation the Combined Plan proposes for him as a

8

consultant over the next two years (Doc. 78, at 30), the Combined Plan: (A) offers little assurance that the financial challenges that the operation incurred while Mr. Ferguson was the principal will be resolved; and (B) compensates him generously despite the home's history of problematic money management.

MDHHS therefore asks that the majority of the purchase price be allocated to the home's operation.

## CONCLUSION

For these reasons, MDHHS asks that this Court grant its objections and deny approval of the Combined Plan and Disclosure Statement as currently drafted.

Respectfully submitted,

Bill Schuette
Attorney General

/s/ William R. Morris
William R. Morris
Assistant Attorney General
Attorneys for Michigan
Department Health and
Human Services
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI  48909
(517) 373-7700
morrisw@michigan.gov
P31957

Date:  August 10, 2016

## PROOF OF SERVICE (E-FILE)

I hereby certify that on August 10, 2016, I electronically filed the foregoing document(s) with the Clerk of the Court using the ECF System, which will provide electronic notice and copies of the filed Objections to Debtor's First Amended Combined Plan of Liquidation and Disclosure Statement to those parties registered or otherwise entitled to receive electronic notice in the case.

/s/ William R. Morris
William R. Morris
Assistant Attorney General
Attorneys for Michigan
Department of Health and
Human Services
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 373-7700
morrisw@michigan.gov
P31957