**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF MICHIGAN**

**FLINT**

In the Matter of:                                    Case No. 16-30397

**FERGUSON CONVALESCENT HOME, INC.**          In Proceedings Under
                                                     Chapter 11

                    Debtor.                          Hon. Daniel S. Opperman

_____/


**FERGUSON CONVALESCENT HOME, INC.'S SECOND AMENDED**
**COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT**


                              **SUBMITTED BY:**
                              **Martin W. Hable**
                              **Attorney for Debtor's**
                              **235 W. Genesee St., Ste. B**
                              **Lapeer, MI 48446**
                              **(810) 667-7123**
                              **hablelaw@yahoo.com**


1
{00661831.1}

**PLAN OF LIQUIDATION**

**INTRODUCTION**

Ferguson Convalescent Home, Inc., ("Debtor") hereby proposes in good faith the following Plan of Liquidation (the "Plan") for the resolution of outstanding Creditor Claims and equity Interests (each as defined below).   Reference is made to the Disclosure Statement (as that term is defined below) for a discussion of the Debtor's history, business, properties, results of operations, risk factors and a summary and analysis of the Plan.

**ARTICLE I**

**DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW**

1.1    **SCOPE OF DEFINITIONS; RULES OF CONSTRUCTION**    For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meaning ascribed to them in this Article I of the Plan.  Any term used in the Plan that is not defined in this Article I of the Plan, but is defined in the Bankruptcy Code, the Bankruptcy Rules (as defined below) or the Disclosure Statement shall have the meaning ascribed to such terms in the Bankruptcy Code, the Bankruptcy Rules or the Disclosure Statement as the case shall be.  Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine and the feminine gender shall include masculine.

1.2    **DEFINITIONS**

1.2.1    "**Administrative Claim**"  means a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 507(b) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) or 507(b) of  the Bankruptcy Code, including, but not limited to, (a) the actual necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business of the Debtor, including wages, salaries or commissions for services rendered after the Petition Date, (b) Professional Fees, (c) all fees and charges assessed against the Estate under 28 U.S.C. § 1930 and (d) all Allowed Claims that are entitled to be treated as administrative claims pursuant to a Final Order under Section 546(c)(2) of the Bankruptcy Code.

1.2.2    "**Administrative Creditor**" means any Creditor holding an Allowed Administrative Claim.

1.2.3    "**Allowed**" means when used in reference to a Claim or Interest, within a particular Class, an Allowed Claim or Allowed Interest of the type described in such Class.

1.2.4    "**Allowed Claim**" means

2

A.   A Proof of Claim or Interest that was:

    1.   Timely filed;

    2.   Deemed filed pursuant to Section 1111(a) of the Code; or

    3.   Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing given to the Debtor and counsel for the Debtor; <u>and</u>

B.   1.   The Claim is not a Contested Claim or a Contested Interest,

<u>or</u>

    2.   The Claim is allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court.

1.2.5   "**<u>Auction Sale</u>**" means the sale of the Debtor's assets free and clear of all liens, claims and encumbrances under 11 U.S.C. §363, conducted pursuant to bidding procedures included in the Plan Supplement.

1.2.6   "**<u>Avoidance Actions</u>**" means all claims granted to the Debtor-in-Possession or to the Estate under Chapter 5 of the Bankruptcy Code.

1.2.7   "**<u>Ballot</u>**" means the document (as appropriate for each Class) substantially in the form attached as Exhibit 1.2.7 and distributed to all Creditors in connection with the solicitation of votes for or against the Plan.

1.2.8   "**<u>Bankruptcy Code</u>**" means the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code (11 U.S.C. §§101, <u>et</u> <u>seq.</u>), as in effect as of the Petition Date.

1.2.9   "**<u>Bankruptcy Court</u>**" or "**<u>Court</u>**" means the United States Bankruptcy Court for the Eastern District of Michigan, Flint Division, or such other court as may have jurisdiction over this Chapter 11 Case.

1.2.10   "**<u>Bankruptcy Rules</u>**" or "**<u>Rules</u>**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court that became effective on August 1, 1991, and any amendments thereto, and the Federal Rules of Civil Procedure, as amended, and as made applicable to the Chapter 11 cases or proceedings therein.   To the extent applicable, Bankruptcy Rules also refers to the Local Rules of the U.S. District Court for the Eastern District of Michigan, as amended and as applicable to this Chapter 11 Case and the Local Bankruptcy Rules for the Eastern District of Michigan, as amended.

1.2.11   "**<u>Bar Date(s)</u>**" means the date(s), if any, designated by the Bankruptcy

Court as the last date(s) for filing Proofs of Claim or Interest against the Debtor, or otherwise asserting any Claim against the Debtor, or, in the absence of such designation, as shall be applicable under the Bankruptcy Rules.

1.2.12 "**Bed Licenses**" mean the bed licenses issued by the State of Michigan to the Debtor for use in the operation of the Debtor's skilled long term nursing care facility.

1.2.13 "**Bed Taxes**" shall mean the amounts owed by the Debtor to the State of Michigan on the Closing Date under the Michigan Medicaid Quality Assurance Assessment established by Michigan Public Act 303.

1.2.14 "**Business Day**" means any day, other than a Saturday, Sunday or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

1.2.15 "**Cash**" means legal tender of the United States or equivalence thereof.

1.2.16 "**Causes of Action**" means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Actions, unless otherwise waived or released by the Debtor to the extent such Cause of Action is a Cause of Action held by the Debtor or the Reorganized Debtor.

1.2.17 "**Chapter 11 Case**" means the above titled case currently pending before the Bankruptcy Court styled *In re Ferguson Convalescent Home, Inc.* (Bankr. Case No. 16-30397).

1.2.18 "**Claim**" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.2.19 "**Class**" means a category of Holders of Claims or Interests as described in Article III of this Plan.

1.2.20 "**Closing Date**" is the date upon which the Purchase Price is paid and the Purchased Assets transfer with authority of the State of Michigan to the Purchaser.

1.2.21 "**Collateral**" means the assets of a Debtor's Estate that secure a Secured Claim.

4

{00661831.1}

1.2.22 "**Committee**" means the official committee of unsecured creditors or any other official committee that has been or may be appointed pursuant to section 1102(a) of the Bankruptcy Code in this case.

1.2.23 "**Confirmation Date**" means the date on which the Bankruptcy Court shall enter the Confirmation Order.

1.2.24 "**Confirmation Hearing**" means the last date on which the Court holds a hearing to consider the confirmation of the Plan under Section 1128 of the Bankruptcy Code.

1.2.25 "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Code.

1.2.26 "**Contested**" means when used in reference to a Claim or Interest in this Plan, any Claim or Interest as to which Debtor or any other party in interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

1.2.27 "**Creditor**" means any Holder of a Claim against the Debtor.

1.2.28 "**Cure**" means the payment or other honor of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law: (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such lesser amount as may be agreed upon by the parties, under such executory contract or unexpired lease.

1.2.29 "**Deficiency Claim**" means any Claim asserted by a Secured Claim Holder that is not an Allowed Secured Claim.

1.2.30 "**Disallowed Claim**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to

5
{00661831.1}

either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

1.2.31 **"Disclosure Statement"** means the written Disclosure Statement that relates to the Plan, attached hereto, as amended, supplemented or modified from time to time, and that was prepared and distributed in accordance with Section 1125 of the Bankruptcy Code and applicable Bankruptcy Rules.

1.2.32 **"Disputed Claim"** or **"Disputed Interest"** means a Claim or any portion thereof, or an Interest or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest, as the case may be.

1.2.33 **"Effective Date"** is the date that is fourteen days after the Confirmation Date.

1.2.34 **"Estate"** means the estate of a Debtor created pursuant to Section 541 of the Bankruptcy Code.

1.2.35 **"Exhibit"** means any document identified as an "exhibit" in this Plan, as modified, amended, or supplemented.

1.2.36 **"Final Decree"** means the decree contemplated under Bankruptcy Rule 3022.

1.2.37 **"Final Order"** means an order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken, (ii) any timely appeal has been finally determined or dismissed and the time for any successive appeal has expired and no successive appeal has been timely taken or, (iii) in the discretion of the Reorganized Debtor, an appeal has been timely taken but such order has not been stayed within ten (10) days after the filing of such appeal.

1.2.38 **"GAAP"** means generally accepted accounting principles.

1.2.39 **"Group"** means one or more similarly situated Creditors who hold or may allege Claims against the Debtor whose Claims are not subject to classification pursuant to Section 1123(a)(1) of the Bankruptcy Code.

1.2.40 **"Holder"** means a Person holding a Claim, Interest, or Lien, as applicable.

1.2.41 **"Impaired"** when used in reference to a Claim or Interest, has the meaning set forth in Section 1124 of the Bankruptcy Code.

1.2.42 **"Insider"** has the meaning as set forth in Section 101(31) of the Bankruptcy Code.

6
{00661831.1}

1.2.43 **"Interest"** means any equity interests in the Debtor, of any kind or nature, including without limitation, any corporate share interests.

1.2.44 **"Interest Rate"** means, for each Claim, except as otherwise expressly set forth in the Plan, (a) the prime rate of interest published in the Wall Street Journal on the Confirmation Date (or, if no prime rate of interest is published on the Confirmation Date, the most recent prime rate of interest published in the Wall Street Journal prior to the Confirmation Date), (b) with respect to a claim for taxes, the interest rate applicable under non-bankruptcy law or (c) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

1.2.45 **"IRS"** means the United States Internal Revenue Service.

1.2.46 **"Lien"** means a charge against, or an interest in property to secure payment of a debt or performance of an obligation.

1.2.47 **"Liquidation Trust"** means the trust which may be established for the benefit of unsecured claims and governed by the Trust Agreement.

1.2.48 **"Liquidation Trustee"** means the Trustee appointed pursuant to the Liquidation Trust.

1.2.49 **"Person"** shall have the meaning given to it under section 101(41) of the Bankruptcy Code.

1.2.50 **"Petition Date"** means February 24, 2016, the date upon which the Debtor voluntarily filed for relief pursuant to chapter 11 of the Bankruptcy Code.

1.2.51 **"Plan Supplement"** refers to the implementing documents necessary to effectuate this Plan, including, but not limited to the Trust Agreement, bidding procedures and auction notice which shall be on file with the Clerk of the Bankruptcy Court at least thirty days prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court.

1.2.52 **"Priority Claim"** means a Claim under or entitled to priority under any of the following sections of the Bankruptcy Code; §§ 507(a)(1), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), 507(a)(7) and 507(a)(8) of the Bankruptcy Code.

1.2.53 **"Priority Creditor"** means any Creditor holding a Priority Claim or Priority Tax Claim.

1.2.54 **"Priority Tax Claim"** means a Claim under or entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.2.55 **"Professional"** means any professional employed in the Chapter 11 Case

pursuant to Sections 327 or 1103 of the Bankruptcy Code seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Section 503(b)(4) of the Bankruptcy Code.

1.2.56  **Professional Fees**" means the fees and reimbursement for disbursements and expenses owed to Professionals.

1.2.57  **Proof of Claim**" means a Claim properly filed by a Holder of a Claim before the Bar Date.

1.2.58  **Purchaser**" means the winning bidder at the Auction Sale.

1.2.59  **Pro-Rata**" means at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims (including disputed or Contested Claims) in such Class unless the Plan expressly provides otherwise.

1.2.60  **Sale Proceeds**" means the remaining proceeds of the Auction Sale after payment of customary closing costs and broker fees.

1.2.61  **Schedules**" means the schedules of assets and liabilities, the list of holders of Interests and the statement of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1017 as such schedules and statements have been, or may be supplemented or amended through the Confirmation Date.

1.2.62  **Secured Claim**" means a Claim secured by a Lien on property in which the Estate has an interest but only to the extent of the value of the Creditor's interest in the Estate's interest in the property as of the Petition Date and only if such Secured Claim is Allowed.

1.2.63  **Trust Agreement**" means the Ferguson Convalescent Home Liquidation Trust Agreement included in the Plan Supplement.

1.2.64  "**Trust Successors**" means Paul Ferguson and Phebe Dennis, the successors of Anna Lee Ferguson under the Anna Lee Ferguson Living Trust u/a/d/ March 24, 1987.

1.2.65  **Unsecured Claim**" means a Claim that is neither a Secured Claim, an Administrative Claim, a Priority Claim, nor a Priority Tax Claim.

1.2.66  **Unsecured Creditor**" means any Creditor that holds an Unsecured Claim.

1.2.67  **Voting Deadline**" means the date set by the Bankruptcy Court for the submission of Ballots as set forth in the Order of the Bankruptcy Court granting preliminary approval to the Disclosure Statement.

8

1.2.3   **RULES OF INTERPRETATION**   For purposes of the Plan;

1.2.1   Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially on such terms and conditions.

1.2.2    The words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan unless expressly stated otherwise.

1.2.3   Captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or effect the interpretation of the Plan.

1.2.4   The rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

1.2.5   The Disclosure Statement may be used as an aid for interpretation of this Plan to the extent that any provision of this Plan is determined to be vague or ambiguous. However, to the extent any statement in the Disclosure Statement conflicts with any provision of this Plan, this Plan controls.

**COMPUTATION OF TIME**   In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall govern.

**GOVERNING LAW** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Michigan shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan.

1.6   **EXHIBITS AND PLAN SUPPLEMENT DOCUMENTS** All Exhibits and Plan Supplement documents are incorporated into and are a part of this Plan and Disclosure Statement as if set forth in full herein and, to the extent not annexed hereto, such Exhibits and Plan Supplement documents. Upon its filing, the Exhibits and Plan Supplement documents may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours or at the Bankruptcy Court's website for a fee at https://ecf.mieb.uscourts.gov. The Exhibits and Plan Supplement documents may also be requested in writing from the Debtor's counsel. **All Exhibits and Plan Supplement documents may be revised prior to the Confirmation Date by the filing of the revised version with the Bankruptcy Court, so long as the revised version are substantially in conformance with the terms of this Plan.** Any reference in the Plan or Disclosure Statement to an existing document or Exhibit filed or to be filed means such document, including Plan Supplement documents, or Exhibit as it may have been or may be amended, modified or supplemented.   The Exhibits and Plan Supplement documents are an integral part of the Plan, and entry of the Confirmation Order by the Bankruptcy Court shall constitute an approval of the Exhibits.

9
{00661831.1}

1.7    **ESTIMATES OF CLAIMS** Unless expressly stated otherwise, nothing herein or in the Disclosure Statement shall be deemed to be an admission by the Debtor or to otherwise prejudice the Debtor in any claims objection or Cause of Action. All estimates of Causes of Action and Claim amounts listed in this Plan, Disclosure Statement, Plan Supplement and/or Exhibits are current estimates only. All Claim amounts and classifications remain subject to the Claim Objection process as set forth in Article XI.

## ARTICLE II

## TREATMENT OF CLAIMANTS NOT SUBJECT TO CLASSIFICATION

Administrative Creditors and Priority Tax Creditors shall be paid as follows:

2.1    **GROUP I - ADMINISTRATIVE CLAIMS** The Claims of Group I shall consist of, without limitation, Holders of Administrative Claims, if and when Allowed. Holders of Administrative Claims may include, without limitation, the Office of the United States Trustee for unpaid quarterly fees, Martin W. Hable, the Allowed Administrative Claim of McClaren Long Term Care Pharmacy and taxes that qualify as Administrative Claims.

2.1.1    Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during this Chapter 11 Case, each Holder of an Allowed Administrative Claim will receive, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim on such date as may be mutually agreed upon between Debtor and the claimant, or, if no such date is agreed upon: (a) if such Allowed Administrative Claim is allowed as of the Confirmation Date, no later than five (5) days after the Confirmation Date or as soon as reasonably practicable thereafter; (b) if the Claim is not Allowed as of the Confirmation Date, no later than forty-five (45) days after the date on which an order of the Bankruptcy Court allowing such Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Estate in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

2.1.2    Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court or as provided herein, requests for payment of Allowed Administrative Claims, including for any Professional Fee Claims, must be filed and served on the Debtor no later than forty-five (45) days after the Confirmation Date (the "Administrative Claims Bar Date"). Holders of Allowed Administrative Claims that are required to file and serve a request for payment of such Allowed Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Claims against the Debtor or their property, and such Claims shall be deemed discharged as of the Confirmation Date.

2.1.3 Except as otherwise specifically provided in the Plan, after the Confirmation Date, the Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay the reasonable fees and expenses incurred by Professionals on or after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may pay any Professional in the ordinary course of business without any further notice, action, order or approval of the Bankruptcy Court.

2.1.4 Except as otherwise specifically provided in the Plan, any Person or Entity that requests compensation or expense reimbursement for making a substantial contribution to this Chapter 11 Case pursuant to Bankruptcy Code sections 503(b)(3), (4) or (5) must file an application and serve such application on counsel for the Debtor, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules on or before the Administrative Claim Bar Date, or be forever barred from seeking such compensation or expense reimbursement. All rights of the Debtor the United States Trustee and all other parties in interest to object to such request are expressly reserved. Notwithstanding anything herein to the contrary, the IRS is authorized to file an Administrative Claim at any time before such date that is sixty days after the Debtor files any tax returns covering the period of time that is after the Petition Date but before the entry of the Confirmation Order.

2.2 **GROUP II - PRIORITY TAX CLAIMS** The Claims of Group II shall consist of the Allowed Claims that are entitled to priority under Section 507(a)(8) of the Bankruptcy Code (as more fully set forth in the Disclosure Statement, the Debtor's Schedules and the Court's claims register).

2.2.1 The Allowed Claim for payment of Bed Taxes shall be paid from the Sale Proceeds at or prior to the Closing Date, or on other terms which are agreed upon in writing between the Holder(s) of the Allowed Claim(s) for Bed Taxes and the Purchaser of Debtor's assets.

2.2.2 To the extent the Sale Proceeds are sufficient to pay all remaining Allowed Priority Tax Claims in their order of priority, then such claims shall be paid from the Sale Proceeds within thirty days of the Closing Date. To the extent the Sale Proceeds are not sufficient to pay all remaining Allowed Priority Tax Claims in their order of priority, Holders of Allowed Priority Tax Claims may elect to be treated in one of the following ways:

(ii) By receiving (a) a lump sum payment equal to its pro-rata share of the value of the liquidated trust assets available after deducting an amount deemed by the Liquidating Trustee to be reasonably necessary to fund the Trust operations (the "Distributable Funds"); (b) subsequent lump sum payments equal to its pro-rata share of the Distributable Funds whenever such pro-rata share equals at least $25,000.00; and (c) a final distribution sufficient to pay the Allowed Priority Tax Claims in full, plus interest calculated at the applicable statutory rate, or, if no statutory rate applies, at a rate equal to

11

the yield on a five-year United States Treasury Bill as of the Confirmation Date, which distribution shall be made when the Claimant's pro-rata share of the Distributable Funds is sufficient to make such payment.

OR

(ii)     By receiving twenty (20) deferred equal quarterly cash payments equal in the aggregate, to the amount of each Allowed Priority Tax Claim, plus interest calculated at the applicable statutory rate, or, if no statutory rate applies, at a rate equal to the yield on a five-year United States Treasury Bill as of the Confirmation Date.  The first quarterly payment shall be made on the first Business Day of the third calendar month after the Confirmation Date and quarterly thereafter.  The foregoing, notwithstanding, the final payment shall be due on the fifth anniversary of the Petition Date.

2.2.3    Notwithstanding anything herein to the contrary, the Debtor or the Liquidating Trustee is entitled to pre-pay, in whole or in part, any Allowed Priority Tax Claim prior to the fifth anniversary of the Petition Date without penalty.

2.2.4    Holders of an Allowed Priority Tax Claim may elect to be treated under section (1) or (2) above by filing written notice of such election with the Clerk of the Court on or before the Funding Date, or such later date as is allowed by the Liquidating Trustee in its sole discretion, with no requirement of service other than to ECF recipients.  To the extent the Holder of an Allowed Priority Tax Claim does not make an election, the Trustee shall treat the creditor in accordance with section (2) above.

2.3    **DETERMINATION OF PRIORITY CLAIMS** The Plan Proponent shall have the right to challenge any Priority Claim through the claims objection process set forth in Article XI of this Plan, which challenge may include, but need not be limited to, a challenge to any penalty portion of such Claim, the amount and the value of the property which forms the basis for any assessment of taxes and the computation of the tax.  The right to challenge these Claims shall include, without limitation, an objection to the assessment of the Debtor's real or personal property that may or may not have been made by the respective taxing authority.

## ARTICLE III

### SPECIFICATION OF TREATMENT OF CLASSES OF CLAIMS OR INTERESTS NOT IMPAIRED UNDER THE PLAN AND THOSE IMPAIRED UNDER THE PLAN

All holders of claims against the Debtor and the Estate, other than the Claims treated in Article II, are divided into the Classes set forth in this Article III for all purposes, including voting on, confirmation of and distribution under the Plan.  A Claim will be entitled to the treatment accorded to a particular Class only to the extent that such Claim is an Allowed Claim.

Except as specifically set forth in the Plan, nothing in the Plan or the Disclosure

Statement shall constitute or be deemed to constitute an admission that the Debtor is subject to or liable for any Claim, and the Debtor reserves all rights to challenge any such assertion.

The Plan divides Claims and Interests into five (5) Classes and treats them as follows:

3.1.   **Class I**   Class I consists of the Allowed Claim of the IRS.

    **3.1.1**   The IRS shall have a Lien on and security interest in the portion of the Sale Proceeds which are not otherwise necessary to pay Bed Taxes and Allowed Administrative Claims, up to the amount of the IRS Allowed Secured Claim.

    **3.1.2**   All Sale Proceeds remaining after payment of the Bed Taxes, Allowed Administrative Claims and any Allowed Secured Claims with a higher priority, shall be paid to the IRS up to the amount of its Allowed Secured Claim.

    **3.1.3**   Any portion of the IRS's Allowed Secured Claim that is not satisfied by the Sale Proceeds shall be paid from the Liquidation Trust in its order of priority.

    **3.1.4**   Any portion of the IRS' Allowed Claim which is not Secured, shall be treated as a Group II Claim or a Class IV Claim, as appropriate, and entitled to the same treatment as other Allowed Claims in that Group or Class.

    **3.1.5**   **This Class shall be Impaired.**

3.2   **Class II**   Class II consists of the Allowed Claim of the Michigan Department of Treasury ("Treasury").

    **3.2.1**   The Treasury shall have a Lien on and security interest in the portion of the Sale Proceeds which are not otherwise necessary to pay Bed Taxes and Allowed Administrative Claims up to the amount of the Treasury's Allowed Secured Claim.

    **3.2.2**   All Sale Proceeds remaining after payment of the Bed Taxes, Allowed Administrative Claims and any Allowed Secured Claims with a higher priority, shall be paid to the Treasury up to the amount of its Allowed Secured Claim.

    **3.2.3**   Any portion of the Treasury's Allowed Secured Claim that is not satisfied from the Sale Proceeds shall be paid from the Liquidation Trust in its order of priority.

    **3.2.4**   The portion of the Treasury's Allowed Claim which is not Secured, shall be treated as a Group II Claim or a Class IV Claim, as appropriate, and entitled to the same treatment as other Allowed Claims in that Group or Class.

13
{00661831.1}

**3.2.5   This Class Shall Be Impaired.**

3.3    **Class III**    Class III shall consist of the Allowed Secured Claim of Wolverine Bank.

3.3.1    Wolverine Bank shall have a Lien on and security interest in the portion of the Sale Proceeds which are not otherwise necessary to pay Bed Taxes and Allowed Administrative Claims up to the amount of Wolverine Bank's Allowed Secured Claim.

3.3.2    All Sale Proceeds remaining after payment of the Bed Taxes, Allowed Administrative Claims and any Allowed Secured Claims with a higher priority, shall be paid to the Wolverine Bank up to the amount of its Allowed Secured Claim.

3.3.3    Any portion of Wolverine Bank's Allowed Secured Claim that is not satisfied from the Sale Proceeds shall be paid from the Liquidation Trust in its order of priority.

3.3.4    Any portion of Wolverine Bank's Allowed Claim which is not Secured, shall be treated as a Class IV Claim and entitled to the same treatment as other Allowed Class IV Claims.

**3.3.5    This Class Shall be Impaired.**

3.4    **Class IV.**    Class IV shall consist of the Holders of Allowed Unsecured Claims.

3.4.1    Holders of Allowed Class IV Claims shall be entitled to receive, on a Pro-Rata basis, distributions from the Liquidation Trust in the order of their priority and in accordance with the terms of the Trust Agreement.

**3.4.2    This Class Shall be Impaired.**

3.5    **Class V**    Class V consists of the Holders of Interests in the Debtor.

3.5.1    The Holder of an Interest in the Debtor shall not receive any distribution on account of its Interest.

3.5.2    On the Closing Date, the Purchaser shall either, in its discretion:

(a)    cancel the Interests and purchase all of the Debtor's assets used in connection with the business of the Debtor; or

(b)    purchase the Interests.

**3.5.1    This Class shall be Impaired.**

14
{00661831.1}

# ARTICLE IV
## EXECUTION AND IMPLEMENTATION OF THE PLAN

    **4.1**    **Sale of Assets**    This Plan contemplates the retention of an investment bank to market for sale substantially all of the Debtor's assets, except Avoidance Actions, free and clear of all liens, claims and encumbrances under 11 U.S.C. § 363(f).

    4.1.1    The Debtor shall be responsible to conduct the Sale in accordance with bidding procedures approved by the Court.

    4.1.2    Until the Closing Date, the Debtor shall continue to operate as a Debtor-in-Possession, and shall continue to provide the same quality care to its residents that it provided prior to the filing of this Plan, and shall continue to maintain the Medical Records (defined below) in accordance with applicable law.

    4.1.3    The ultimate Purchaser of the Debtor's assets, shall be required to maintain the Debtor's current residents at the Facility unless (i) any resident departs the facility in the normal course of business and in accordance with any applicable law or ordinance, or (ii) until the Purchaser transfers any such residents out of the Facility in accordance with the laws of the State of Michigan, Federal Government and any and all other state or local governing bodies authorized to oversee such a process.

    4.1.4    The ultimate Purchaser of the Debtor's assets shall take possession of all of medical records regarding Debtor's current and former residents which are in the Debtor's possession (the "Medical Records") and shall maintain and/or dispose of such Medical Records in accordance applicable state, federal or local law which are applicable to the Medical Records, the Debtor or the Purchaser. The maintenance and disposition of the Medical Records shall be done at no expense to the Debtor or Debtor-in-Possession, and shall be the sole expense of and responsibility of the Purchaser.

    4.1.5    The ultimate Purchaser of Debtor's assets shall provide

written notice to the Debtor's residents within 15 days of the Auction Sale, regarding (i) its identify as the winning bidder; (ii) the date on which the Purchaser is expected to close on the purchase of Debtor's assets; and (iii) a description of any changes the residents might expect as a result of the sale, including a discussion of any expected change of management and the identity of the new management company.

**4.2** **The Liquidating Distribution of Sale Proceeds.** Any Sale Proceeds remaining after payment in full of the Bed Taxes, all Allowed Secured Claims and Allowed Administrative Expenses shall be paid to the Liquidating Trustee for administration pursuant to the Liquidation Trust, which shall provide for the payment of creditors in the order of their priority, as set forth more detail in Articles I through III of this Plan.

4.3 **Vesting of Assets of Estate** Upon the Closing Date and subject only to the terms of this Plan, all assets of the Debtor and the Estate not sold to a purchaser or otherwise dealt with in the Plan, wherever situated, shall vest in the Liquidating Trust, free and clear of all liens, claims, encumbrances and interests.

4.4 **Execution of Liquidating Trust** On or before the Closing Date, the Liquidating Trustee and the Debtor will execute the Liquidating Trust.

4.5 **Appointment of Liquidating Trustee** The Liquidating Trustee, as identified in the Liquidating Trust, shall have the powers, duties, and obligations set forth in this Plan and in the Liquidating Trust. After the Closing Date, all actions required by the Debtor shall be taken by the Liquidating Trustee, or its designee, in the name of, and on behalf of, the Debtor and the Estate. The Liquidating Trustee shall be authorized to execute documents on behalf of the Debtor and the Estate.

4.6 **Funding the Liquidation Trust** Within thirty (30) days of the Closing Date, the Debtor shall either (i) pay each Allowed Secured Claim, or (ii) reserve sufficient funds to pay Allowed Secured Claims in the amount set forth in any filed Proof of Claim, and shall thereafter pay any excess Sale Proceeds to the Liquidation Trust. In addition, all assets of the Debtor and the Estate not sold to the purchaser or otherwise dealt with in this Plan, wherever situated and of whatever nature shall be transferred to the Liquidating Trust, free and clear of all liens, claims, encumbrances and interests, except where this Plan specifically provides for the continuation of a liens, claims, encumbrances and interests.

4.7 As to the United States of America, its agencies, departments or agents (collectively, the "United States") and the State of Michigan, including DHHS, nothing in the Second Amended Plan or Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtor or Reorganized Debtor are entitled to under the

16
{00661831.1}

Bankruptcy Code, if any. The discharge, release and injunction provisions contained in the Second Amended Plan and Confirmation Order are not intended and shall not be construed to bar the United States or the State of Michigan, including DHHS from, subsequent to the Confirmation Order, pursuing any police or regulatory action.

4.8     With respect to the Internal Revenue Service, nothing in the order, incorporating documents, or any future order of the Court may be interpreted by any party to impact on the ability of the Internal Revenue Service to assess, collect, or otherwise determine the tax liability (whether in the form of taxes, penalties, and/or statutory interest) of any officer, employee, or other responsible party of the Debtor. Moreover, nothing in this order, incorporated documents, or any future order of the Court may be interpreted to predetermine any tax consequence, whether of the debtor or any other party, regarding the IRS's rights to duly assess, collect, examine, or otherwise determine any tax liability under non-bankruptcy law.

4.7     **Payment of Claims and Claimholder's Rights after Payment**   The Debtor may pre-pay any Claim, other than Claims held by Insiders or Affiliates, at any time without penalty or liability for unmatured interest. The Debtor may negotiate discounts in exchange for pre-payments. Upon satisfaction of all obligations by Debtor to any Claim Holder, the Debtor shall have no further obligation to such Claim Holder under this Plan, and such Claim Holder shall have no further or continued rights or standing under this Plan.

4.6     **Causes of Action and Avoidance Actions**   Upon the Effective Date, the Liquidation Trust shall have standing to pursue any and all Causes of Action and Avoidance Actions. The Debtor has not yet investigated any Avoidance Actions. Potential Avoidance Actions may include avoidance of pre-petition payments to Insiders within one year of the Petition Date, avoidance of other pre-petition payments within 90 days of the Petition Date, avoidance or challenge to any Liens asserted against property of the Debtor or the Reorganized Debtor, avoidance of any unauthorized payment made after the Petition Date, and avoidance of any fraudulent conveyance that may have been made within six years of the Petition Date. Other Causes of Action preserved by this Plan include all accounts receivable, collection actions, contract claims, and commercial tort claims held by the Debtor. Potential defendants include all Persons that transact business with the Debtor and any Person listed in the Debtor's statements of financial affairs (available at the Bankruptcy Court or upon request to Debtor's counsel) as having received a payment within ninety (90) days of the Petition Date. **All Causes of Action, including Avoidance Actions, are specifically reserved, whether or not specifically listed in the Plan or Disclosure Statement.** The Debtor shall have full discretion to pursue, litigate, settle and/or abandon any Cause of Action or Avoidance Action. Unless any cause of action against a Person is expressly waived, released, compromised or settled in the Plan or a Final Order, the Debtor specifically reserves all causes of action for later adjudication, and, therefore, no preclusion doctrine, res judicata, estoppel (judicial, equitable or otherwise) or laches shall apply to any of the causes of action upon, after or as a consequence of the confirmation of the Plan, entry of the Confirmation Order, the Effective Date or consummation of the Plan. Whether or not any Cause of Action is pursued or abandoned, the Debtor reserves its rights to use any

17

Cause of Action defensively, including for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to section 502(d) of the Bankruptcy Code or otherwise.

**4.7** **Professional Fees and Authorization of Interim Fee Applications** All services performed or expenses incurred by any Professional on behalf of the Debtor with respect to this Chapter 11 Case after the Confirmation Date, shall be Administrative Claims and shall not be subject to the prior review and approval of the Bankruptcy Court. Notwithstanding any provision of the Bankruptcy Code or Rules, including, without limitation, Bankruptcy Rule 2016, after the Confirmation Date, no Professional shall be required to disclose payments from a Debtor to the Bankruptcy Court or the United States Trustee. All fees and expenses of the Debtor arising after the Confirmation Date shall be billed directly to the Debtor and the Bankruptcy Court shall only review that portion to which the Debtor objects. The Debtor shall pay the portion not objected to in accordance with the terms of the invoice. Professionals are hereby authorized to file an interim fee application after the entry of the Confirmation Order but before the Effective Date.

**4.8** **Change of Address** In order to ensure that it receives its distribution, each Creditor holding a Claim must advise the Debtor and/or Liquidation Trustee, as applicable, of any change in address. Absent any such notification Debtor and/or Liquidation Trustee, as applicable, shall send payments to the address listed on the Matrix on file with the Bankruptcy Court. If the payment is not negotiated within four (4) months after being mailed, it shall be void.

**4.9** **Corporate Action and Effectuating Documents** Each of the matters provided for in this Plan involving the Debtor, including corporate action to be taken or required of Debtor, shall, as of the Confirmation Date, be deemed to have occurred, approved, authorized, and shall be effective as provided under this Plan without the requirement of any further action of any kind by the shareholders, directors, officers, or board of the Debtor. Any officer of Debtor shall be and hereby is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate on behalf of the Debtor to effectuate and further evidence the terms and conditions of this Plan without further notice to or order, action or approval of the Debtor's board or the Bankruptcy Court.

### ARTICLE V

### EFFECT OF CONFIRMATION

**5.1** **SUBORDINATED CLAIMS** Pursuant to section 510 of the Bankruptcy Code, the Debtor reserves the right to re-classify (or request that the Bankruptcy Court re-classify) any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**5.2** **INJUNCTION** Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold Claims that have been

18

subject to treatment under the terms of the Plan, are permanently enjoined from taking any of the following actions against any of Debtor (or its Property), the purchaser, the Liquidation Trust or Liquidation Trustee on account of any such Claims, debts, liabilities, or terminated rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing any action in any manner, in any place that does not comply, or is consistent, with the provisions of this Plan.

5.5    **PROTECTIONS AGAINST DISCRIMINATORY TREATMENT**    Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons, including Governmental Units, shall not discriminate against the Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtor or other Person with whom Debtor has been associated, solely because the Debtor has been a Debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

5.6    **SETOFFS**    Except as otherwise expressly provided for in the Plan, the Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable to non-bankruptcy law, or as may be agreed by the Holder of a Claim, may setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtor may hold against the Holder of such Allowed Claim (or against the predecessor in interest to Holder to the extent that the Holder takes such Allowed Claim subject to setoffs and defenses that may be asserted against the predecessor in interest), to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtor of any Claims, rights, setoff rights and Causes of Action that Debtor may possess against such Holder.  The Debtor shall not be required to make any distributions to the Holder of any Allowed Claim to the extent that the Debtor asserts setoff rights against such Holder until after entry of a Final Order resolving such setoff rights.  In no event shall any Holder of Claims be entitled to setoff any Claim against any Claim, right, or Cause of Action of the Debtor unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

5.7    **RECOUPMENT**    Except with respect to any taxing authorities, whose setoff rights or recoupment under applicable law shall not be impaired, in no event shall any Holder of a Claim or Interest be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of

19
{00661831.1}

the Debtor unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

## ARTICLE VI

### MODIFICATION OF THE PLAN

6.1     **AMENDMENTS TO PLAN**     Debtor may, from time to time, propose amendments or modifications of this Plan prior to its confirmation, without leave of the Court.  After confirmation, the Debtor, with leave of the Bankruptcy Court and upon notice and opportunity for hearing to the affected Creditor(s) only, may remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order or otherwise modify the Plan.

6.2     **REVOCATION OR WITHDRAWAL OF THE PLAN**     The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent Chapter 11 plans.  If the Debtor revokes or withdraws the Plan, or if confirmation or consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption, assignment, or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the right of Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by Debtor or any other Person.

## ARTICLE VII

### JURISDICTION OF THE COURT

7.1     This Court shall retain jurisdiction in this matter until the Plan has been fully consummated including, but not limited to, the following reasons and purposes:

A.     The classification of the Claim of any Creditor, including, without limitation, assessment of Claims under Section 506 of the Bankruptcy Code, and the re-examination of Claims that have been allowed for purposes of voting, and the determination of such objections as may be filed to Claims of Creditors.  The failure by Debtor to object to, or to examine, any Claim for the purposes of voting, shall not be deemed to be a waiver of any right to object to, or reexamine the Claim in whole or in part.  Furthermore, the fact that this Plan has provided a treatment for the benefit of a particular Creditor shall not in any way be deemed to be a waiver of any right to object to or re-examine the Claim or any secured interest whether by mortgage or otherwise which secures such Claim, in whole or in part.

B.     The determination of all questions and disputes regarding title to the assets

of the Estate, and all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the Confirmation Date, between Debtor or any other party.

C.      The correction of any defect, the curing of any omission or the reconciliation of any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan.

D.      The modification of this Plan after confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code and as provided as in Article VI of the Plan.

E.      The enforcement and interpretation of the terms and conditions of this Plan and the entry of orders in aid of confirmation of this Plan.

F.      The entry of any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor or any party-in-interest, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Court may deem necessary, to accomplish its obligations under the Plan.

G.      The review and approval of all Professional Fee applications for services rendered prior to the Confirmation Date and the review of any Professional Fees for services rendered in connection with the Plan after the Confirmation Date, to the extent that the Debtor disputes all or a portion thereof.

H.      The assumption or rejection of executory contracts under Article X of this Plan.

I.      The litigation of any Avoidance Actions.

J.      The entry of an order determining the extent and/or validity of any Lien.

K.      The Proposed Sale of the Debtor's assets to the Purchaser.

L.      The entry of an order concluding and terminating this Chapter 11 Case.

## ARTICLE VIII

### TITLE TO PROPERTY

8.1      **VESTING OF PROPERTY**  Except as provided otherwise herein, title to any of the Debtor's property not sold, transferred or otherwise disposed of pursuant to the terms of this Plan (including all Causes of Action and Avoidance Actions not released under 3.1.2) shall vest in the Liquidation Trust upon the Closing Date.  As of and following the Closing Date, the Liquidation Trust may acquire and dispose of property and settle and compromise Claims or Interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or

Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order.

**ARTICLE IX**

**UNITED STATES TRUSTEE FEES**

9.1    **U.S. TRUSTEE FEES**    The Debtor shall pay to the United States Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6) and shall provide the relevant information as required by the Office of the United States Trustee until the Chapter 11 Case is administratively closed.    Upon the Closing, the Plan shall be deemed to be substantially consummated and the Court shall enter an order administratively closing the case.

**ARTICLE X**

**EXECUTORY CONTRACTS**

10.1    **EXECUTORY CONTRACTS**

10.1.1 The Debtor's Medicaid Provider Agreement with the State of Michigan Department of Health and Human Services ("DHHS") is hereby assumed, and any required cure amount will be paid to the DHHS in the ordinary course between the parties.

10.1.2 The Debtor's Medicare Provider Agreement is hereby assumed, and any required cure amount will be paid to Centers for Medicare & Medicaid Services ("CMS") in the ordinary course of business between the parties.

10.1.3 Notwithstanding anything to the contrary in this Plan, the Debtor shall not reject any collective bargaining agreement subject to section 1113 of the Bankruptcy Code without further order of the Bankruptcy Court under the requirements of section 1113.

10.1.4 On the Closing Date, all executory contracts shall be rejected, unless (i) on or before thirty (30) days after the Auction Sale, the Debtor shall file a list of contracts that shall be assumed, (ii) such executory contract was, prior to the Effective Date, the subject of a motion to assume, or (iii) such executory contract is the subject of a motion to assume filed by the Debtor on or before thirty (30) days after the Auction Sale. All assumed contracts assigned to the Purchaser shall be cured by the purchaser pursuant to Section 10.2, unless other provisions have been agreed to by the counter-party. As long as the purchaser complies with this provision, the contract counterparty must fulfill all contract obligations and is enjoined from declaring a default for non-performance due to the bankruptcy or pre-assumption default.

10.2    **RESOLUTION OF CURE CLAIM DISPUTES.**    For each executory contract or unexpired lease to be assumed under this Article X, within thirty (30) days after the sale of assets,

{00661831.1}

the purchaser shall deliver a written proposal to the contract counter-party describing the method, timing and amount of any cure. The purchaser's proposal shall be binding unless the contract counter-party delivers a written objection to the purchaser's counsel within fifteen (15) days after receipt of the proposal, in which event the purchaser and contract counter-party shall meet and confer in good faith. In the event that the dispute cannot be resolved, either party may petition the Bankruptcy Court to resolve the dispute through filing of a properly noticed motion.

10.3 **REJECTION CLAIMS.** Any Creditor who has a Claim as a result of such rejection shall have thirty (30) days after receipt of the notice of rejection of its contract to file a Proof of Claim, failing which such Claim shall be disallowed in its entirety.

10.4 **OBJECTIONS TO REJECTION CLAIMS.** The Reorganized Debtor may file an objection to any Proof of Claim filed in accordance with this Article X and in accordance with Article XI.

10.5 **REJECTION OF UNEXPIRED LEASES** Upon the occurrence of the Confirmation Date, all unexpired leases shall be rejected, except for unexpired leases that are the subject of a motion to assume filed prior to the Confirmation Date.

10.6 **PRELIMINARY ASSUMPTION PENDING CHALLENGES** The assumption of a contract or lease under this Article does not prejudice the Debtor or purchaser's right to challenge whether any contract or lease is an executory contract or unexpired lease, as opposed to a disguised security agreement. If the Debtor or purchaser challenges an assumed contract or lease, the Debtor shall not be required to comply with the disputed portions of the contract or lease until a Final Order is entered resolving the dispute. If the dispute is not resolved in the Debtor or purchaser's favor, the Debtor has the right to reject the contract or lease for a period of ten (10) days after entry of a Final Order.

## ARTICLE XI

### OBJECTIONS TO CLAIMS

11.1. **TIMING OF OBJECTIONS** The Debtor, Liquidating Trustee or the purchaser may object to the allowance and priority of any Claim, or the extent, validity and enforcement of any security interest, whether listed on the schedules filed by Debtor or filed by any Creditor, on or before the later of (a) sixty (60) days from the date of filing of any Proof of Claim or (b) six (6) months after the Confirmation Date. The Debtor, Liquidating Trustee or the purchaser may petition the Bankruptcy Court for an extension of this time by filing an appropriate motion. The service of the motion through the Court's electronic court filing system shall be sufficient notice of any such request. Any Claim not the subject of a timely objection shall be an Allowed Claim.

11.2 **EXTENT OF OBJECTIONS** As part of the objection process set forth in Section 11.1 above, and without limiting same, the Debtor, purchaser and/or Liquidation Trustee shall have the

23
{00661831.1}

right to object to any Lien asserted against property of the Debtor or the Liquidating Trust.

11.3 **CLAIM DISPUTE RESOLUTION PROCEDURES** Resolution of disputes regarding Claims shall be subject to the following parameters:

11.3.1 If the Settlement Amount for any Claim is less than $100,000.00, the Debtor or Liquidation Trustee shall be authorized to settle such Claim without the need for further Bankruptcy Court approval or further notice.

11.3.2 If the Settlement Amount for a Claim is greater than or equal to $100,000.00, the Debtor or Liquidation Trustee shall file a proposed settlement stipulation with the Bankruptcy Court with notice and hearing consistent with the Local Rules and the Bankruptcy Rules.

11.3.3 Court authority is not required for any settlement between the purchaser and any Creditor for which the purchaser is assuming the Creditor's Allowed Claim.

11.4 **CLAIMS BAR DATE** Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Date such late Claim has been deemed timely Filed by a Final Order.

## ARTICLE XII

## PROVISIONS GOVERNING DISTRIBUTION

12.1 **DISPUTED PAYMENTS** Notwithstanding anything in this Plan to the contrary, the Debtor, purchaser or Liquidation Trustee shall not be obligated to make any payments towards the Disputed portion of any Disputed Claim. The Debtor or Liquidation Trustee shall withhold any such payments, and, if the dispute is resolved in favor of the Claim Holder, the Debtor shall make any missed distributions within fourteen (14) days after entry of a Final Order determining the Claim.

12.2 **EFFECT OF ASSUMPTION AND CURE** These distribution procedures shall not apply to any Claim resulting from an executory contract or unexpired lease assumed by the Debtor. The Cure provisions of Article X and any agreement with the counter-party shall exclusively apply to distributions on such Claims.

12.3 **DELIVERY OF DISTRIBUTIONS IN GENERAL**: Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests shall be made by the Debtor, in order of preference, (a) at the addresses set forth in any written notices of address changes delivered to the Debtor after the

date of any related Proof of Claim, (b) at the addresses set forth on the Proofs of Claim Filed by such Holders of Claims, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor has not received a written notice of a change of address, or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Except as set forth herein, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtor shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

12.4    **ALLOCATION OF PAYMENTS**  All distributions shall be allocated first to principle until the principle amount of the Claim is paid in full, next to interest if interest is Allowed in relation to the Claim and finally, to fees, costs and expenses if such are Allowed.

12.5    **COMPLIANCE WITH TAX REQUIREMENTS AND ALLOCATIONS**  In connection with the Plan, to the extent applicable, the Debtor shall be authorized to take all actions necessary or appropriate actions to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtor reserves the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.

12.6    **UNDELIVERABLE DISTRIBUTIONS AND NON-NEGOTIATED CHECKS**  If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Debtor is notified of the then-current address of such Holder of the Claim, after which time future distributions shall be made to such Holder of the Claim without interest at such address. If checks issued by the Debtor on account of Claims are not negotiated within one hundred and twenty (120) days after the issuance of such check, the check shall be null and void. Amounts in respect to undeliverable distributions and non-negotiated checks shall be held by the Debtor until (i) such distributions are claimed or (ii) ninety (90) days after the check is returned or voided for due to non-negotiation, after which date all such undistributed and non-negotiated amounts shall revert to the Debtor free of any restrictions thereon and the Claim of any Holder or successor to such Holder with respect to such distribution shall be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary. Nothing contained herein shall require the Debtor to attempt to locate any Holder of an Allowed Claim.

12.7    **FRACTIONAL PAYMENTS**  Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars shall not be required. Payment of fractions of dollars that would otherwise be distributed under the Plan shall be rounded to the lower whole number of dollars.

25
{00661831.1}

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1   **RELEASE OF LIENS**   The Debtor and all parties-in-interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan.  This shall include without limitation any execution by the Debtor of UCC financing statements and the execution by Creditors of any UCC or mortgage discharges, releases or terminations.

13.2   **SETOFFS AND COUNTERCLAIMS**   No Creditor (including without limitation a Person or entity that becomes a Creditor as a result of a rejection of a contract) shall be allowed to setoff a Claim against an obligation to the Debtor arising in connection with a different contract.  Unless expressly asserted in the Chapter 11 Case through the filing of a Proof of Claim, all setoffs and counterclaims are waived pursuant to Article V of this Plan.  The terms of this paragraph shall not apply to any taxing authority.

13.3   **COMPROMISE OF LITIGATION**   The Debtor shall have the right to commence, continue, amend or compromise all causes of action (including without limitation any Avoidance Action and any action described in the Debtor's Disclosure Statement) available to the Debtor or the Estate whether or not those Causes of Action were the subject of a suit as of the Confirmation Date.

13.4   **NOTICES**   Any notice to the Debtor required under this Plan shall be addressed to the Debtor and delivered by (i) U.S. certified mail, return receipt requested, (ii) reputable overnight courier service with tracking, or (iii) hand-delivery:

|  |  |
|---|---|
| To Debtor at: | Paul Ferguson |
|  | 239 S. Main St. |
|  | Lapeer, MI 48446 |
|  |  |
| And a copy to: | Martin W. Hable |
|  | 235 W. Genesee St., Ste. B |
|  | Lapeer, MI 48446 |

Failure to comply with this Section 13.4 shall render any notice to the Debtor to be invalid for purposes of this Plan.

13.5   **SUCCESSORS AND ASSIGNS**   This Plan and the Confirmation Order shall inure to the benefit of, and be binding upon, all parties-in-interest and their respective successors and assigns.

## DISCLOSURE STATEMENT

{00661831.1}

# I. INTRODUCTION AND OVERVIEW

## A. PURPOSE OF DISCLOSURE STATEMENT

All capitalized terms unless defined in this Disclosure Statement shall have the meaning ascribed to them in the Debtor's Plan of Liquidation (the "Plan"), unless the context indicates a different meaning.

Debtor submits this Disclosure Statement (the "Disclosure Statement") pursuant to Section 1125 of the Bankruptcy Code, 11 U.S.C. §§101 et seq., to all known Holders of a Claim against it. The Debtor has filed the Plan with the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division – Flint, a copy of which accompanies this Disclosure Statement.

Debtor provides this Disclosure Statement to its Creditors to disclose information material and necessary for Creditors to make a reasonably informed decision in exercising their right to vote for the acceptance of the Plan.

## B. SOURCE OF INFORMATION

The Disclosure Statement and the Plan have been prepared from information furnished primarily by Debtor. Debtor's counsel has not conducted an independent investigation to verify such information.

Certain materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are summaries of other documents. While every effort has been made to retain the meaning of such documents or portions of documents that have been summarized, the Debtor urges that any reliance on the contents of such documents be dependent upon a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall govern and apply.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified. Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change of the facts set forth herein since the date of this Disclosure Statement.

NO PERSON OR ENTITY HAS BEEN AUTHORIZED BY THE DEBTOR OR THE COURT TO GIVE ANY INSTRUCTIONS OR MAKE ANY REPRESENTATIONS CONCERNING THE DEBTOR, ITS FINANCIAL AFFAIRS, OR THE VALUE OF ITS PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS, PROMISES OR INDUCEMENTS, PARTICULARLY REGARDING THE DEBTOR'S PROPERTY OR FUTURE INCOME, MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN, WHICH ARE OTHER THAN AS

27

**CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. SUCH REPRESENTATION, INDUCEMENTS AND/OR PROMISES, IF ANY, SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO, IN TURN, SHALL DELIVER SUCH INFORMATION FOR SUCH ACTION AS THE COURT MAY DEEM APPROPRIATE.**

### C. OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting a rehabilitation or liquidation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

The consummation of a plan of liquidation is the principal objective in a Chapter 11 liquidation case. A plan of liquidation sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of liquidation by the Bankruptcy Court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of liquidation has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Debtor is submitting this Disclosure Statement to holders of Claims against, and equity Interests in, the Debtor to satisfy requirements of Section 1125 of the Bankruptcy Code.

## II. DESCRIPTION OF THE DEBTOR

### A. THE DEBTOR-IN-POSSESSION

On February 24, 2016 (the "Petition Date"), the Debtor filed a Voluntary Petition under Chapter 11 of Title 11 of the United States Code, §§ 101 et. seq. in the United States Bankruptcy Court for the Eastern District of Michigan, Flint, Case No. 16-30397. The case was assigned to

{00661831.1}

the Honorable Daniel S. Opperman.  Upon filing the Chapter 11 Petition, the Debtor became a "Debtor-in-Possession" as the term is understood in the Bankruptcy Code.

### THE DEBTOR'S PRINCIPALS AND MANAGEMENT

1.    **Background & Compensation**

a.    Paul Ferguson has been a nursing home administrator for the past thirty-eight years.  He has studied business administration and accounting at Walsh College and St. Clair Community College.  Mr. Ferguson currently serves as the Debtor's Vice President and Administrator and he is responsible for the overseeing the Debtor's operations.  Mr. Ferguson receives a salary of approximately $6,380 per month, plus health insurance, as compensation for the services he provides to the Debtor.

b.    Phebe Dennis has been in the nursing home industry for almost fifty years, and currently serves as the Debtor's Director of Nursing and oversees the Debtor's nursing department.  Ms. Dennis has completed both the LPN and RN programs at Mid-Michigan Community College and St. Clair County Community College, respectively.  Ms. Dennis receives a salary of approximately $5,381.72 per month, plus health and life insurance, as compensation for the services she provides to the Debtor.

2.    **Legal Relationship Between Principals and Debtor**

a.    The Debtor operates out of a facility located at 239 S. Main St., in LaPeer, Michigan (the "Facility").  The Facility is owned by the Trust Successors.  The Debtor pays rent to the Trust Successors for its use of the Facility and certain related properties in the approximate amount of $6,050 per month.  The Debtor believes that the Trust Successors are Paul Ferguson and Phebe Dennis.

b.    The Debtor also utilizes an additional and adjoining parcel of real property commonly known as 908 Turrill Ave., in Lapeer Michigan (the "Second Parcel") which is owned by Ferguson Properties.  The Debtor's primary use of the Second Parcel is as storage for its supplies and equipment.  The Debtor pays rent to Ferguson Properties in the approximate amount of $1,520 per month for its use of the Second Parcel.  Ferguson Properties is owned by Paul Ferguson and Phebe Dennis.

3.    **Future Principals and Management of Debtor and Compensation**

The Debtor anticipates that Paul Ferguson will continue to operate the Debtor and Phebe Dennis will continue to serve as the Director of Nursing after the Confirmation Date until the Closing Date, at which time the Debtor's operating assets will be sold to a purchaser.  Upon sale of the Debtor's assets, Paul Ferguson and Phebe Dennis will cease working for the Debtor and will only work for the purchaser in the even a mutually acceptable employment relationship is independently forged with the purchaser.

**B.**     **THE DEBTOR'S BUSINESS/ CAUSES FOR CHAPTER 11 FILING**

The Debtor began operating as a nursing home in 1953 and subsequently incorporated in 1968.  Anna Lee Ferguson was the sole shareholder of the Debtor at the time of her death on January 20, 2016.  Currently the Debtor is being operated by Anna Lee Ferguson's son and daughter, Paul Ferguson and Phebe Dennis.  The Debtor is licensed by the State of Michigan and is certified to accept both Medicare and Medicaid residents.

Traditionally the Debtor only participated in the Medicaid program and was one of the only nursing homes in the State of Michigan that operated this way.  Over the years, the Medicaid Reimbursement system has become politicized and a function of the State budget. Today most accountants in the nursing home business describe Medicaid as a breakeven business, at best.  Historically, the payment system would go thru cycles and after a year or two, reimbursement would improve.  However, the reimbursement cycle applicable to the Debtor has not improved over the last 15 to 20 years. The Debtor gradually became an undercapitalized enterprise even as Anna Lee Ferguson reinvested all of her available capital.

The Debtor previously filed for Chapter 11 bankruptcy protection on April 6, 2010. The filing became necessary when the IRS levied all the Debtor's bank accounts and State Medicaid payments.  This posed an eminent threat to the health and safety of the Debtor's residents.   With some improvement in its Medicaid reimbursement and a plan to seek Medicare certification, the Debtor was able to confirm a plan of reorganization.

In 2011 the Debtor requested and received certification for the Medicare program.  This additional payor source helped with both revenue and cash flow.  However, in the fall of 2011 a competing facility, Stonegate Health Campus ("Stonegate"), opened in Lapeer.  This new facility features all two bed and private rooms which the Debtor does not offer.  Since Stonegate opened, the Debtor has seen a gradual decline in its census.

The Debtor currently houses between 60 and 70 residents.  The facility has 18 three bed rooms which are difficult to fill.  The decline in the Debtor's census has caused a series of cash flow problems that have prevented the Debtor from making plan payments and some tax deposits.  The Debtor suffered additional cash flow issues when the State of Michigan further reduced its Medicaid reimbursement rate.  The Medicaid rate reductions were a result of the Debtor's census being below 85 percent for more than two years.  As of October 1, 2015, the Debtor's Medicaid rate was reduced from $163.44 to $142.21 per day and the Quality Assurance Supplement was reduced from $54,516.00 to $44,011.00 per month.  The result was a monthly reduction in the Debtor's revenue of approximately $42,031.00 with no corresponding reduction in Debtor's operating costs.

Although Debtor's cash flow has been extremely stressed, the Debtor has made some very positive changes that have contributed to its financial health.  Some of these efforts have been successful and others have not.

30
{00661831.1}

1.  In March of 2013, the Debtor was listed for sale. The Debtor received several offers and signed a letter of intent but the deal fell through because of the buyer's inability to secure financing. The Debtor then withdrew the facility from the market because its declining census was causing a decline in market value.

2.  The Debtor worked with the State and entered into payment plans related to Medicaid payments due to the State, freeing up the Debtor's cash flow. These payment plans included payments on post-petition QAA fees and an agreement to use settlements due to the Debtor toward post-petition QAA fees. This resulted in all QAA fees being current as of Sept 30, 2015.

3.  The Debtor negotiated with the Michigan Department of Treasury to avoid further aggressive collection activity. The Debtor establish a payment plan for past due taxes, and Debtor made timely payments through February, 2016. The State of Michigan defaulted the Debtor under the payment plan after the IRS levied Debtor's bank accounts causing the one of the Debtor's checks to the State of Michigan to be returned for non-sufficient funds.

4.  The Debtor paid all pre-petition IRS trust fund taxes due as of the first bankruptcy filing.

5.  The Debtor hired a company in March of 2015 to assist in negotiating a payment plan with the IRS after waiting nearly a year for the IRS to assign the case to an agent. The IRS agent that was eventually assigned levied the Debtor's accounts in February 2016, causing an eminent threat to their health and safety of Debtor's residents. As a result, the Debtor filed the current Chapter 11 on February 26, 2016.

6.  Prior to the Petition Date, the Debtor investigated many options to obtain financing with the intent of using the proceeds of such financing to pay off debt. However, the Debtor was unable to secure a lender due to IRS liens on its assets.

III.   **POST-PETITION EVENTS OF SIGNIFICANCE**

A.   **POST-PETITION TRANSFERS OUTSIDE OF THE ORDINARY COURSE OF BUSINESS**

The Debtor has not made any post-petition transfers outside of the ordinary course of business during this Case.

31
{00661831.1}

### B. CHAPTER 11 EVENTS AND ORDERS

### 1. Employment of Professionals and Patient Care Ombudsman

On March 8, 2016, the Court entered its *Order for Appointment of Attorney* [Dkt. No. 19], authorizing the Debtor to retain Martin Hable, as its counsel in this Chapter 11 bankruptcy.

Pursuant to its *Notice of Appointment of Patient Care Ombudsman*, filed on March 24, 2016 [Dkt. No. 32 in furtherance of the Court's *Order Directing United States Trustee to Appoint Patient Care Ombudsman* [Dkt. No. 10], the United State Trustee's office appointed Deborah L. Fish as the Patient Care Ombudsman for the Debtor.

### 2. Meeting of Creditors

The section 341 Meeting of Creditors was held and concluded on March 30, 2016.

### 3. Order Establishing Deadlines and Procedures

On April 7, 2016, the Court entered its *Chapter 11 Case Management Order Establishing Deadlines and Procedures for a "Small Business" Debtor* [Dk. No. 36], establishing August 22, 2016, as the deadline for the Debtor to file its plan and disclosure statement.

### 4. DIP Financing & Adequate Protection

On June 30, 2016, the Court entered its *Order Granting Motion for Entry of an Interim Order Authorizing Debtor to (A) Grant Replacement Liens; (B) Obtain Post-Petition Financing; (C) Grant Priming Liens, Security Interests and Superpriority Administrative Expense Status Under 11 U.S.C. §§ 105, 361, and 364(c) and (d)(1) and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Interim Order") [Dkt. No. 65], authorizing Debtor to obtain post-petition financing and to grant replacement liens to the IRS.

The Court subsequently entered its *Final Order Authorizing Debtor to (A) Grant Replacement Liens; (B) Obtain Post-Petition Financing; (C) Grant Priming Liens, Security Interests and Superpriority Administrative Expenses Status under 11 U.S.C. §§105, 361, 364 (c) and (d)(1); (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (E) Granting Related Relief* [Dk. No. 76] ("Final Order"). Pursuant to the terms of the Final order, the Debtor was authorized to borrow up to $50,000 in debtor-in-possession financing, according to a budget to be filed by the Debtor, without further order of the Court.

The party who had previously agreed to provide the Debtor with financing pursuant to the Final Order has declined to proceed as the Debtor's DIP Lender, and as a result the Debtor does not currently have access to DIP financing.

{00661831.1}

**5.      Litigation Involving the Debtor**

There is no post-petition litigation involving the Debtor.

IV.    ASSETS AND LIABILITIES

**A.      LIQUIDATION ANALYSIS**

The Debtor's Liquidation Analysis is attached hereto as Exhibit A. In the event the Debtor's Plan is not accepted by the Creditors or is not otherwise confirmed by the Bankruptcy Court, the Debtor believes that it will be unable to continue to operate as a going concern because its Medicaid receivables will be attached leaving it with no operating capital. If the Debtor ceases operating it will no longer have any going concern value and there is substantial risk that it will lose its Bed Licenses which are its most valuable assets. Furthermore, an unstructured closure of the Debtor's facility would result in the emergency relocation of the Debtor's residents which would be detrimental to their health and safety.

**B.      RISKS, CONDITIONS AND ASSUMPTION IN LIQUIDATION ANALYSIS**

All values stated in the Liquidation Analysis for assets, liabilities, costs, expenses and potential recoveries are based on good faith estimates using information currently available to the Debtor. The Debtor's estimates have not been subject to audit or appraisal. The estimates shall in no way be construed to constitute binding guaranties, representations or warranties and are subject to revision at any time.

Except as otherwise noted herein or in the Plan, the values for the Debtor's assets, as set forth in the Bankruptcy Schedules filed in connection with the Bankruptcy Petition, reflect the Debtor's best estimate of the market value of its assets, except where noted to the contrary. In establishing the values, Debtor has considered the size, age, physical condition and location of the assets, in addition to the need for certain additional capital requirements.

Upon liquidation/sale of assets, there will be significant setoffs and adjustments to the Debtor's accounts receivable, which are primarily Medicaid receivables. The amounts provided are conservative estimates, but the setoffs and adjustments may result in a value that is lower than the Debtor anticipated when drafting the Liquidation Analysis.

**C.      CAUSES OF ACTION**

The Debtor is not aware of any Causes of Action not otherwise set forth herein. Furthermore, the Debtor has not undertaken an analysis of what claims it may have under Chapter 5 of the Bankruptcy Code and the potential defenses thereto, and cannot make any representations as to their value. However, the Debtor has filed detailed schedules and a statement of financial affairs that disclose the Debtor's relevant pre-petition transfers.

{00661831.1}

The Debtor reserves the right to collect all accounts receivable and all other amounts due Debtor for any reason whatsoever (whether owed to Debtor pursuant to contract rights, quasi contract, tort law, refund rights, deposits, or for any other reason). The Debtor reserves all setoff and recoupment rights of all kinds. The Debtor reserves the right to commence avoidance actions pursuant to 11 U.S.C. §§ 544, 545, 547, 548, 549 and 550 (the "Avoidance Actions"). Accordingly, the Debtor may have potential causes of action and reserves its right to bring a lawsuit against any entity listed on Debtor's Schedules (as filed with the Bankruptcy Court) as owing a debt to the Debtor, and any entity listed on their Statement of Financial Affairs (as filed with the Bankruptcy Court) as having received a transfer from the Debtor. More specifically, and without waiving any other claim, the Debtor may seek to avoid from any direct or indirect transferee, (i) under § 547 of the Code, any transfer of an interest of the Debtor in property which occurred within 90 days of the Petition Date, or, for insiders of the Debtor, within one year of the Petition Date; (ii) under § 544(a) and 545, any liens asserted against the Debtor, (iii) under §§ 544(b) and 548, any actual or constructive fraudulent transfers or obligations, and (iv) under § 549, any unauthorized post-petition transactions.

In addition, the Debtor reserves the right to collect and pursue all Causes of Action arising before or after the Petition Date in the ordinary course against any and all Persons with which the Debtor has contractual, trade or account relations, including all Causes of Action relating to breaches of contract, collection of accounts receivable and other actions against the Debtor's clientele that may owe money or other obligations to the Debtor, breach of warranties or representations, supply of non-conforming or deficient goods or services, overpayments, credits, setoffs, demands for turnover of property, and any other Causes of Action that the Debtor may have arising under applicable state or federal law against the Debtor's customers, trade suppliers and other business partners of any nature whatsoever.

### D. SECURED CREDITORS

The Claims listed herein are for description purposes only and not an admission by Debtor or any other person. The Debtor reserves the right to contest the amount of any Secured Claim or Unsecured Claim, and if applicable, any asserted security interest or Lien, or the priority or extent thereof.

### 1. IRS

Prior to the Petition Date, the IRS filed various tax liens against the Debtor's assets to secure tax obligations allegedly owed by the Debtor to the IRS. According to the IRS' Proof of Claim, the total amount owed by the Debtor as of the Petition Date was $1,671,825.87 of which the IRS claims $1,464,106 is secured by the Debtor's assets (the "IRS Claim"). The Debtor disputes that $1,464,106 of the IRS Claim is secured by a perfected security interest, and instead believes that a maximum of $1,065,446 of the IRS Claim is secured by a perfected security interest. In addition, the Debtor believes that the IRS' Allowed Secured Claim is far less under 11 U.S.C. §506 (a)(1) because the value of the Debtor's assets is far less than the amount the IRS Claim.

34
{00661831.1}

The Debtor plans to file a motion under 11 U.S.C. §502(c) to estimate the amount of the IRS' Allowed Secured Claim under 11 U.S.C. §506 (a)(1).

**2.** **State of Michigan – Treasury**

The State of Michigan – Treasury alleges that it holds a secured claim against the Debtor in the amount of $143,693.73 secured by a tax lien on the Debtor's assets. The Debtor believes that the State of Michigan UIA's Claim is entirely Unsecured under 11 U.S.C. §506 (a)(1) because its security interest is junior to the interests of the IRS and there is not sufficient equity remaining in the assets to secure the amounts owed to the State of Michigan – Treasury.

**3.** Wolverine Bank

Wolverine Bank claims an all asset security interest in the Debtor's assets to secure a term loan from the Debtor to Wolverine Bank which matured on September 30, 2016 (the "Wolverine Loan"). The Wolverine Loan is also secured by a mortgage on the Facility. The Debtor estimates the balance of the Wolverine Loan as of September 30, 2016 at $145,289.04.

**E.** **PRIORITY CLAIMS AND ANTICIPATED ADMINISTRATIVE EXPENSE CLAIMS**

The Claims listed herein are for description purposes only and not an admission by Debtor or any other person. The Debtor reserves the right to contest the amount of any Secured Claim or Unsecured Claim, and if applicable, any asserted security interest or Lien, or the priority or extent thereof.

While it is impossible to accurately estimate administrative expenses as of the date of this Disclosure Statement, as such estimate depends on various unknown factors including the total duration of the Chapter 11 Case and the nature and extent of additional administrative expenses, including professional expenses, the Debtor anticipates the following Priority and Administrative Claims:

| Claimant | Estimated Amount | Proof of Claim Amount | Classification |
|---|---|---|---|
| Internal Revenue Service | | $203,050.75 | Priority |
| State of Michigan UIA | | $39,970.80 | Priority |
| State of Michigan – DHHS | | $243,782.06 | Priority |
| State of Michigan – Treasury | | $262,776.77 | Priority |
| City of Lapeer | | $61,680.96 | Priority |
| Martin Hable | $9,500 | | Administrative |
| United States Trustee | $6,500 | | Administrative |
| McLaren | $4,000 | | Administrative |

Further information on Claims can be found by accessing the claims register on the Bankruptcy Court's website. Administrative expense claims for Professionals are subject to

35
{00661831.1}

review and approval by the Bankruptcy Court.

    F.      **N**ON-PRIORITY **U**NSECURED **C**LAIMS AND **U**NDERSECURED **C**LAIMS

    The Claims listed herein are for description purposes only and not an admission by Debtor or any other person. The Debtor reserves the right to contest the amount of any Secured Claim or Unsecured Claim, and if applicable, any asserted security interest or Lien, or the priority or extent thereof.

    G.      **C**O-**O**BLIGORS WITH **D**EBTOR

    The Claims listed herein are for description purposes only and not an admission by Debtor or any other person. The Debtor reserves the right to contest the amount of any Secured Claim or Unsecured Claim, and if applicable, any asserted security interest or Lien, or the priority or extent thereof.

    *1.*    The IRS has asserted that Paul Ferguson and Phebe Denis are co-liable for some or all of the Debtor's obligations to the IRS for withholding taxes.

    *2.*    Paul Ferguson has personally guaranteed repayment of the Wolverine Loan.

**V.**    **I**MPLEMENTATION OF **P**LAN

    A.      **F**INANCIAL **I**NFORMATION

        1.      **Pre-Petition Financial Summaries**

    The Debtor has attached as Exhibit B, financial summaries relating to the years 2013 and 2014. These documents summarize the Debtor's financial history prior to the commencement of Debtor's bankruptcy proceeding.

        2.      **Post-Petition Financial Summaries**

    The Debtor has attached as Exhibit C, summaries of its financial performance during these Chapter 11 proceedings. These documents summarize the financial condition relating to the Debtor's post-petition operations. The source of this summary is the Debtor's books and records.

        3.      **Plan Projections**

    The Debtor has attached as Exhibit D, its summary of post-confirmation financial projections for the life of the Plan. The assumptions underlying the Plan projections include an increase in the Debtor's census for Medicare patients, and confirmation of this Plan.

36
{00661831.1}

### B. TAX RAMIFICATION

#### 1. To Debtor

The Debtor believes that the forgiveness of indebtedness will not result in a significant tax consequence to the Debtor. The forgiveness of indebtedness, pursuant to the Internal Revenue Code, can be applied either to the Debtor's basis in its assets or to its net operating loss carry forward. The Debtor cannot accurately determine the amount and extent of any forgiveness of indebtedness. First, the Debtor must determine if all of the Claims that have been filed, or deemed filed within this Case, are accurate. Also, depending on whether the Debtor achieves or exceeds the projection in its current fiscal year, the Debtor may elect to apply any forgiveness of a debt directly to its basis. Despite the fact that the Debtor believes that they can either (a) apply such forgiveness of indebtedness to its net operating loss carry forward or (b) to its basis, it is not expected that the amount of forgiveness of debt will be totally offset by the foregoing. However, once these net operating losses are used by the Debtor to offset forgiveness of indebtedness, they cannot be used again. Taxes paid by the Debtor in the future years would, therefore, be impacted as a result of confirmation of the Plan.

#### 2. To Creditors

The tax consequences to each Creditor resulting from confirmation of the Plan may vary depending upon each Creditor's particular circumstances. Debtor recommends that Creditors or Holders of Claims obtain independent tax counsel to advise them as to the tax consequences of the Plan.

## VI. LEGAL REQUIREMENTS

### A. VOTING PROCEDURES

Under the Bankruptcy Code, only classes of claims or equity interests that are impaired under the plan are entitled to vote to accept or reject a plan. Accordingly, classes of claims or interests that are not impaired are <u>not</u> entitled to vote on the plan.

Creditors that hold Claims in more than one impaired class are entitled to vote separately in each class. Such a Creditor will receive a separate ballot for all of its Claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A Creditor who asserts a Claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to Claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of

{00661831.1}

proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order).  However, any vote by a Holder of a Claim will not be counted if such Claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such Claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

## B.    ACCEPTANCE

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots.  The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots.  If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

## C.    CONFIRMATION

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are

these:

> 1. Each class of impaired creditors and interests must accept the plan, as described in paragraph VI. B., above.

> 2. Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

### D. MODIFICATION

The Debtor reserves the right to modify or withdraw the plan at any time before confirmation.

### E. EFFECT OF CONFIRMATION

If the Plan is confirmed by the Court:

> 1. Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the Plan.

> 2. Except as provided in the plan and in 11 U.S.C. § 1141(d):

>> (a) In the case of a corporation that is reorganizing and continuing business:

>>> i. All claims and interests will be discharged.

>>> ii. Creditors and shareholders will be prohibited from asserting their claims against or interests in the debtor or its assets.

>> (b) In the case of a corporation that is liquidating and not continuing its business:

>>> i. Claims and interests will not be discharged.

>>> ii. Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

>> (c) In the case of an individual or husband and wife:

>>> i. Claims will be discharged, except as provided in 11 U.S.C.

39
{00661831.1}

§§ 523 and 1141(d). Unless the Court orders otherwise, the discharge will be entered only after completion of plan payments as provided in § 1141(d)(5)(a). It is the usual practice of the Court to close Chapter 11 cases after confirmation, then the individual debtor files a motion to reopen the case for entry of discharge upon completion of plan payments.

ii.   Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 1141(d).

Paragraph VI.E.2 (b) applies in this case.

RESPECTFULLY SUBMITTED BY,

/ s / Paul Ferguson _____
Paul Ferguson
President of Debtor-in-Possession

SUBMITTED BY,

/ s / Martin W. Hable _____
MARTIN W. HABLE (P27634)
Counsel for Debtor
235 W. Genesee St., Ste. B
Lapeer, MI 48446
810-667-7123
hablelaw@yahoo.com

Dated: November 22, 2016

**40**
{00661831.1}